[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Petitioner having been found guilty after trial by jury of burglary in the first degree in violations of General Statutes Section 53a-101(a)1, attempted murder in violation of General Statutes Section 53a-49(a)(2) and 53a-54a(a) and assault in the first degree in violation of General Statutes Section 53a-59(a)(1) and sentenced to the custody of respondent Commissioner of Corrections has filed the present petition for a Writ of Habeas Corpus.
Petitioner alleges that her confinement by respondent because of such conviction resulted from a violation of her right to the effective assistance of counsel as guaranteed by both the federal and state constitutions. CT Page 7121
The conviction of petitioner was affirmed by decision of the Appellate Court released January 1, 1991. State v. Murdick, 23 Conn. App. 692 (1991). Certification was denied by the Connecticut Supreme Court on February 5, 1991. State v. Murdick, 217 Conn. 809 (1991).
As hereinafter stated, the issues having been found for the respondent the petition is dismissed.
The underlying facts which support the conviction are set forth in State v. Murdick, supra at pages 692-695 and may be summarized as follows:
Thomas Smith was divorced from the victim, Mabel Marshall Gowac in 1985. Although the, victim was given custody of the couple's two daughters Smith took the daughters to Vermont between July, 1987 and March, 1988 and kept them hidden from the victim and the authorities. While in Vermont Smith lived with petitioner. After his return to Connecticut the daughters were returned to the custody of the victim and Smith lost all visitation rights. The victim also filed a civil action against Smith.
Petitioner requested a longtime mutual friend, Vera Lee, to help Smith regain custody of the children. They discussed accomplishing this by shooting the victim.
On May 20, 1988 petitioner and Lee drove to the victim's house. At the time Lee was armed with a handgun and defendant was armed with a shotgun.
Lee approached the victim at her front door and unsuccessfully offered money for the children while petitioner remained in the car. Petitioner and Lee then drove off.
Approximately three hours later Lee and petitioner returned to the victim's house. Lee, again, went to the front door while petitioner remained in the car. When the victim slammed the door shut on her, Lee fired two shots through the door hitting the victim in the chest.
After being shot the victim locked the door, hid the children in the bathroom closet and telephoned 911 for assistance.
While the victim was on the telephone Lee entered the house and shot the victim two or three more times. Lee then returned to the car and informed petitioner that the victim was still alive. Petitioner then entered the house CT Page 7122 and fired a shotgun at close range twice at the victim who was then hiding in the bathtub.
Petitioner and Lee then drove to Meriden.
An ambulance and paramedics arrived shortly after petitioner and Lee's departure. The victim survived the shooting after extensive medical treatment.
Petitioner disputes this version of the facts which is based to a large extent on Lee's testimony. She denies participation in the shooting.
At the trial petitioner was represented by Attorney Susan O. Story.
By this petition, it is claimed, that petitioner was convicted and is now incarcerated as a result of ineffective assistance of counsel in violation of her constitutional rights.
Before addressing the specific claim which petitioner has advanced the general principles governing claims of ineffective assistance of counsel must be reviewed. Relying on the decision of the United States Supreme Court in Strickland v. Washington, 446 U.S. 668, 687 (1984) our supreme court set forth the basic law on the subject in Aillon v. Meachum, 211 Conn. 352, 357 (1989) as follows:
"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense. . . . Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." "With regard, to the performance component of this, inquiry, `the, defendant must show that counsel's representation fell below an objective standard of reasonableness.' Further, the test for prejudice requires that `[t]he defendant . . . show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" Aillon supra. (Citations omitted.)
The general rule was explained in more detail by the Appellate Court in Chance v. Bronson, 19 Conn. App. 674
CT Page 7123 (1989) at pages 677-678 where the court stated: "In order to prevail on a claim of ineffective assistance of counsel, the petitioner must show (1) that the attorney's performance was so deficient and his errors so serious that counsel was, in effect, not functioning as counsel, and (2) that those errors functioned so as to deprive the petitioner of a fair trial. Levine v. Manson, 195 Conn. 636, 640, 490 A.2d 82 (1985), citing Strickland v. Washington, supra, 687, 694. The petitioner must show that his attorney's performance was not reasonably competent or was not within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. Williams v. Manson, 195 Conn. 561,564, 489 A.2d 377 (1985). Petitioners are entitled to reasonably professional assistance, not to perfect representation. State v. Barber, 173 Conn. 153, 159-60,376 A.2d 1108 (1977). Judicial scrutiny of counsel's performance must be highly deferential, and a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Levine v. Manson, supra. The petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Id. "In fairly assessing the attorney's conduct it is required "that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Id., quoting Strickland v. Washington, supra, 689. The second component of the Strickland test requires that the petitioner demonstrate that counsel's lack of competency contributed to his conviction. Levine v. Manson, supra. The petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Aillon v. Meachum, 211 Conn. 352,559 A.2d 206 (1989). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Id.
The petitioner bears the burden of making both showings. Id. "`Unless a defendant [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.'" Fair v. Warden, 211 Conn. 398,402, 559 A.2d 1094 (1989) quoting Strickland v. Washington, supra, 687." Chance, supra.
A full trial was held on the petition but for the purposes of this memorandum and to reduce confusion the original criminal trial is referred to as the "trial" and the trial on this petition is referred to as the "hearing." CT Page 7124
The petition which frames this action sets forth a number of specific claims in separate lettered subparagraphs of the third paragraph. To resolve the claims presented under the petition, each of the subparagraphs have been considered in light of the evidence and the applicable law.
 I
(3.A, B)
Lee testified that she shot the victim with a handgun, and the petitioner used a shotgun. Gunpowder residue tests were performed on Lee and revealed the presence of such residue on her right cheek and left arm.
Petitioner's argument here is that there was evidence which could have been put before a jury which might cause the jury not to believe Lee's testimony that petitioner fired the shotgun. The evidence might tend to cause the jury to believe Lee fired both weapons.
At trial defense attorney called a Mr. O'Brien of, the State Forensic Science Lab who testified as to the tests performed on swab samples collected from Lee which might show gunpowder residue. The results of these tests may have been degraded because Lee had been allowed to wash her hands and face prior to the tests. Trace elements of a substance consistent with gunpowder, however, were found on Lee's left arm and the same residue was found on her cheek.
Petitioner argues that the attorney should have used a more effective witness and more credible evidence to show the residue on Lee's body was consistent with the firing of a shotgun. In support of this argument petitioner presented the expert testimony of a gentlemen who testified that he was a gunsmith, a research engineer and a consultant in the area of firearms. His expertise in the specific area about which he testified was weak and his testimony was not convincing. It cannot be found that this expert's testimony or a similar expert's testimony would be any better at planting doubt in the minds of the jurors that it was petitioner who used the shotgun than the expert, called by defense counsel.
As a part of her preparation for trial, defense counsel studied the issue and raised the point during the trial. She also argued it to the jury.
It is also noted that in addition to Lee's testimony the state introduced other evidence from which the CT Page 7125 jury could conclude that there were two female shooters of different height and weight.
From all of the evidence it cannot be found that defense counsel's performance at trial on this point, was so deficient as to fall below the objective standards of reasonableness or that it effected the outcome of the case.
 II
(3.C)
In her complaint petitioner made a number of, claims that defense counsel failed to impeach Lee's credibility by demonstrating certain specific errors in her testimony. Since Lee was present at the shooting and was the only eye witness who placed petitioner at the scene of the crime Lee's credibility was vital to the state's case.
At trial Lee testified that after the shooting she and petitioner drove from East Haddam to Meriden. In response to a question about discussion during the trip Lee testified:
 A We passed an ambulance near the bridge that spans the Connecticut River and she said that the ambulance must be headed for her house but that she would sure — the ambulance would surely be too late.
 Q When you say it was near the bridge over the Connecticut River, in which towns are you talking about?
A It was right near the Gelston House.
Petitioner claims that it could not have been possible for Lee's vehicle to have passed an ambulance as described by Lee and that defense counsel was deficient in not demonstrating to the jury that the statement was false.
Argument was made that defense counsel failed to perceive the importance of this testimony, failed to nail down the false testimony on cross examination and did not call a witness who could have demonstrated the error.
At the hearing on this petition Dan Maus, Jr. an E.M.T. who responded to the victim's house was called by petitioner. He testified that he was not interviewed by defense counsel and was not called to testify at trial. CT Page 7126
Maus testified that three medical vehicles were dispatched to the scene. He testified that he was in the only ambulance and that the other vehicles were four wheel drive vehicles. Presumably these vehicles were emergency type vehicles with appropriate markings. There was no direct evidence of the routes taken by these four wheel drive vehicles, but Maus' testimony indicated that his ambulance traveled along Route 151 and then turned on Mt. Parnamus Road. Using this route the ambulance would have passed no closer than a mile and one half from the bridge near the Gelston House.
No doubt cross examination of Lee concerning her statement could have nailed down the spot where she passed the ambulance and what she meant by "near the bridge over the Connecticut River" and "near the Gelston House." She could also have been requested to describe the ambulance to determine if it was in fact the vehicle Maus was riding in and not one of the emergency vehicles or an ambulance on an unrelated mission.
If Lee had been cross examined as now suggested by the petitioner, and if Lee's answers had been favorable to petitioner, defense counsel probably could have called Maus to testify. It may be assumed that Maus' testimony would not have been excluded as an attempt to impeach on a collateral matter. Assuming also that all of the testimony favored petitioner it would constitute a proper attack on Lee's credibility.
Defense counsel, however, in preparation for trial did not think this was an important part of the case and considered that it would be difficult to prove a negative.
It cannot be found that trial counsel's actions with respect to this issue were unreasonable and the court cannot resort to hindsight and make assumptions or to what Lee might have testified to if other questions had been asked.
 III
(3.D, E)
At trial Lee testified that after the shooting she and petitioner drove to Meriden and then with Tom Smith drove around discarding evidence. Later all three ate at a restaurant in Meriden leaving around 7:45 p. m. Petitioner claims that they left the restaurant around 5:43 p. m. and that there was evidence to prove this. The claim is that CT Page 7127 defense counsel was deficient in not introducing this evidence. It is claimed that with this evidence it could have been shown to the jury that Lee was off by two hours in her testimony as to the time they left the restaurant. This it is claimed could well have effected by the plausibility of Lee's whole narration of events.
Douglas B. Robinson, petitioner's husband, testified at the hearing on this petition that prior to and during the trial he discussed with defense, counsel checking with the restaurant for evidence as to the time the meal had been completed. He stated that defense counsel agreed to do this and he was quite surprised when no such evidence was introduced at trial.
At the hearing on this petition a copy of a guest check from a restaurant was introduced. Payment of the check appears to be stamped by the cash register. This stamp included a notation "17-43(TM)." It could be found that this notation indicated that the check was paid at 17:43 or at 5:43 p. m.
There is, however, no evidence that the check in evidence was in any way related to the meal consumed by Lee, Smith and petitioner. In fact there is reason to believe that it does not involve such meal. The check indicates two guests rather than three and indicates that two meals were served and two types of drinks were ordered.
Counsel for petitioner seeks to explain this discrepancy on the basis of his personal experience in the restaurant business. In the absence of some evidence concerning the check a conclusion that it establishes the time of the dinner, however, would be speculation. Also there does not appear to be any date stamped on, the check but in a box marked "Thank you" there is a signature and the date "9/12/89." This is not the date of the crime.
 IV
(3.F)
The victim's two children hiding in a closet were eyewitnesses to some of the shooting. Petitioner claims that the children gave statements to the state police saying that she was not involved. It is claimed that defense counsel's failure to call the children as witnesses was deficient and prejudiced to the defense.
State police detective Youngquist prepared a CT Page 7128 written report of an interview with the two children conducted on May 20, 1988. The report indicates that most of the information came from the child Jessica who said that she saw a woman with white curly hair shoot her mother. Both children stated that they did not know who the people were who shot mommy. Both denied that petitioner was present.
Defense, counsel considered calling the children to testify for the defense and subpoenas were issued but the guardian ad litem for the children refused to allow defense counsel to interview the children prior to trial. The guardian also informed counsel that the children, if called, would implicate petitioner. Under such circumstances defense counsel elected not to call the children.
Petitioner now contends that the children should have been called and then impeached by their contradictory statement. It is noted that impeachment could be complicated by the fact that the written statement made by the children might testify about during the police interview. Of course it would have been improper for counsel to call the children if the primary purpose was to impeach them in hope that the jury might accept the prior inconsistent statement substantively. State v. Graham, 200 Conn. 9, 18 (1986).
It is now claimed that by not calling the children defense counsel lost the opportunity to ask the children how they came to decide that petitioner was in fact an assailant. Such testimony, it is argued might well have illuminated scheming by the victim and others to implicate petitioner and this could have helped create reasonable doubt.
This theory, however, depends on favorable testimony by the children. The substance of this testimony would have been unknown to counsel prior to trial and the defense would have had to contend with the possibly dramatic effect of the children's in court testimony that the petitioner shot their mother.
In reviewing defense counsel's conduct at trial it cannot be found that the decision not to call the children was unsound trial strategy. The decision not to call the children falls within the wide range of reasonable professional assistance to which petitioner was entitled.
 V
(3.G)
In the petition, it is alleged that a member of the CT Page 7129 jury slept through a substantial portion of the trial. This juror was elected foreperson and participated in the deliberation and verdict. The fact that he was asleep was pointed out to defense counsel and she did nothing about it.
Mr. Robinson testified on this claim at the hearing on the petition. Defense counsel and the juror also testified. Considering all of the evidence on the point it must be concluded that petitioner has failed to sustain her burden of proof with respect to the claim.
 VI
(3.J)
Defense counsel failed to present expert medical evidence concerning the effect of the extensive drug abuse on the credibility of Lee. It was claimed that Lee was a long-time drug abuser who had an addiction to amphetamines for over 20 years. It was further claimed that such substance is known to produce irrational behavior, delusional thinking and hallucinations. Petitioner and her husband both testified at the hearing that they discussed with defense counsel her intention to call a medical expert to testify concerning the potential effects of this substance abuse and Lee's ability to comprehend reality and her general sanity.
Defense counsel's version of the discussion about the calling of the expert is more credible that offered by petitioner and her husband. Petitioner claims that there is no shortage of medical experts capable of presenting evidence of the long term effects of amphetamine use on the mental health of a witness. No evidence was offered on this point and the court cannot speculate as to the existence of such experts or what they might testify in light of Lee's medical and psychiatric records.
Defense counsel was able to make some use of these psychiatric records in cross examining Lee.
It cannot be found that defense counsel's handling of the evidence on this issue, or her failure to call an expert as alleged, was defective or fell below the objective standard of reasonableness applicable here.
 VII
(3.J)
It was also alleged that defense counsel was CT Page 7130 deficient in failing to obtain, preserve and present telephone records which might have disproven Lee's claim that she spoke with petitioner by telephone a dozen times a day for months before the trial. Defense counsel testified that she did subpoena the records. Considering all of the evidence it must be found that petitioner has failed to establish the facts underlying the claim.
 VIII
(3.K)
The petitioner also alleges that defense counsel failed to present testimony from an undisputed eye-witness to the victim's statement that petitioner was not involved in, the crime.
The evidence indicated that state police trooper Ditta responding to the scene of the shooting and found the victim wounded and lying in the bathtub. The trooper testified that he asked the victim if she knew who did it. She replied with the name of Vera Lee but he testified that she did not know who the other woman was. The trooper stated that she did not mention the petitioners name.
Also the, victim's sister gave a written statement to the state police in which she related that on the morning after the shooting she visited the victim in the hospital and asked her questions about the event. She stated that she did this by reading the victim's lips as she tried to answer. The sister would repeat what she assumed was the correct answer and the victim would confirm the answer by a nod of her head.
The statement indicates that the victim said that another woman chased her with a shotgun but she did not know who the woman was. The victim was asked if that woman was "Tom's girlfriend" (petitioner). She said no.
It is claimed that although defense counsel did bring out the victim's failure to identify petitioner as an assailant in cross examination of trooper Ditta she was deficient in failing to use this in cross examination of the victim.
At trial the victim testified as to the shooting and the serious wounds she received. On direct examination she gave a physical description of the second shooter but stated that she did not directly look at the face and could not identify the person. She testified that she was lying in CT Page 7131 the bathtub and recalled speaking with trooper Ditta but that she was not positive as to what was said.
On cross examination defense counsel questioned the victim about whether she could identify the second shooter as petitioner and established that the victim could not do so. This was not in consistent with her testimony on direct examination.
Defense counsel also questioned the victim about her conversation with trooper Ditta. Her answers indicated that she had no recollection of this conversation. Considering her physical condition at the time of such conversation this is understandable.
Under the circumstances it is difficult to see how counsel could have exploited the statement to Ditta. The victim stated that she had no recollection of the substance of the conversation with the officer.
There does not appear to be any great conflict between the victim's testimony on direct concerning her inability to identify petitioner as one of its assailants and her subsequent support of the prosecution of the case against petitioner. Questioning the victim as to why she supported prosecution at the time of the trial, if allowed, might not have been in petitioner's best interest.
With respect to the written statement of the victim's sister on cross examination the victim testified that she did not recall her sister's visit. Under the circumstances this was reasonable. It is difficult to see how the statement could have been used in cross examination since the victim had no recollection of the statement.
Petitioner has advanced no theory as to how the written statement or the testimony of the victim's sister could have been placed before the jury as an exception to the rule against hearsay.
In any event, the substance of the sister's hospital questioning of the victim including that portion exculpatory to petitioner was placed before the jury in an exhibit containing detective Minor's affidavit with the arrest warrant.
Again it cannot be found that defense counsel's handling of these matters fell below the standard of reasonable professional assistance. CT Page 7132
 IX
(3.L)
Petitioner alleges that defense counsel failed to marshall for the jury the inconsistencies between Lee's account of the time frame of the crime and flight therefrom with contradictory police records.
This issue was not addressed specifically in petitioner's brief but was covered in respondent's brief. Although petitioner may now argue that it could have been done more effectively it cannot be found that defense counsel was so defective as to fall below the minimum standard of professional conduct to which petitioner was entitled.
Although not alleged in the complaint, petitioner claims in her brief that defense counsel approved an objectional jury instruction which precluded review of that instruction by the appellate court.
It appears that at trial both the state and defense counsel requested the same instructions concerning inferences which the jury might draw from false statements by an accused person. State v. Murdick, 23 Conn. App. 692, 701-704. In her appeal petitioner claimed that the charge constituted plain error of constitutional magnitude.
The appellate court considered the claim under the Evans — Golding rule. See State v. Hinckley, 198 Conn. 77,81 (1985). It was petitioner's appellate claim that the charge diluted the state's burden of proof or impermissibly burdened her right to testify. The appellate court's review of the charge, did not support this claim. It was determined that the language of the charge was addressed to defendant's "consciousness of guilt albeit inartfully." The appellate court found that even if the charge allowed the jury to consider false testimony as evidence of guilt it was harmless. Id. 702-703.
The instruction has been determined as harmless. It had been requested by the state and may well have been given even if defense counsel excepted to its being given. It cannot therefore be found that the result of the trial would have been different if counsel had acted differently.
Considering each of the claims raised by petitioner and the cumulative effect of the actions of defense counsel in light of the claims made it cannot be found that CT Page 7133 petitioner has sustained her burden of proof that defense counsel's conduct was deficient or that her conduct of the trial was such as to deprive petitioner of a fair trial. Aillon v. Meachum, supra; Chance v. Bronson, supra.
Accordingly, the petition for writ of habeas corpus is dismissed.
PURTILL, J.